The next case is United States v. Garro. Is this 10 minutes a side for this case? It's 10 minutes per side. We entered an order to that effect. Yes. Thank you. The time is being corrected to 10 minutes per side per the order. The time allotted is 10 minutes per side per the order that was issued by the court. Okay. I did not get the order, but that's fine. Thank you. Summarize. Didn't you get the order? I did not get the order. We entered an order. Was that order not given to counsel? We asked to have it faxed to them, faxed and filed. I don't show an order. Well, I apologize to counsel. Let me just say then that what we decided was that we didn't need argument on the issues dealing with conviction. We thought the briefs were sufficient for those issues, and what we wanted to focus on was the sentence and damages. Okay. And so we thought half the time would be sufficient. And I apologize to counsel. That order was entered 10 days to two weeks ago, and it was ordered to be faxed to you so that you could adequately prepare for this, and for some reason that was not done. I assure you we will look into it and find out why, and please report to us why that was not done. Okay. So your Honor, would you prefer me to just focus on the sentencing issues? Is that correct? That was what the order suggested. Okay. Julie Blair on behalf of Mr. Garrow. As far as the sentencing issues, of prime importance to Mr. Garrow in his case is the calculation of the loss amount. It's our contention that the loss amount should be offset by the money returned to the investors. This money was returned fully two years before any law enforcement action. Much of the money was returned immediately within two or three months. Curtis Martin received his $2 million back within a couple of months. Child's Hope received their full $10 million back. TLC received $10 million, and then later the $11 million La Jolla Home. All of this was done prior to any discovery of the offense, prior to any notification of law enforcement, and fundamental fairness dictates that Mr. Garrow should be given credit for that money that was returned to the investors prior to any discovery of the offense. It's our contention that the district court clearly erred in finding that simply letters from some of these people saying they'd like their money back would constitute discovery of the offense. These people never notified the authorities. They never said to Mr. Garrow, we think you've committed a fraud. They were investors who were involved in high-stakes investment who, once it got underway, decided they didn't want to be involved anymore. They contacted Mr. Garrow, and Mr. Garrow returned the money. And based on that, he should not be held accountable for such a high amount of loss. But the U.S. v. Bride is pretty straightforward. In there, they calculated the date of discovery on the date that nurses demanded the money, not when the defendant was pursued by the government. I mean, the date was the date of discovery was, in fact, the date on which they used in Bride. Well, I would say in that case, the nurses believed that fraud had occurred. There's no indication from the letters or the communication with Mr. Garrow that these investors thought that he was committing fraud. They simply asked that their investment money be returned, and most of it was returned by Mr. Garrow within a reasonable amount of time. The record does seem to suggest a very high level of concern by the investors, whereas the money repeated contacts, repeated requests, not getting all of their money back. It wasn't just a simple letter you would send to your bank to pull your money out. That's true. There were some people that called him frequently and wrote letters. But, again, there was never an indication by these people that they believed that there was fraud, that Mr. Garrow had defrauded them. They simply got scared. They got cold feet. They thought, well, maybe we took too high of a risk. This was too high of a risk of an investment, and we want our money back. If they believed that there was fraud, why did they never contact the authorities ever? I mean, this only came to light because of the investigation of TLC. But there's not a rule that they have to contact the authorities at this point in our case law. So is it your ñ is the standard you would suggest that the contacts have to indicate expressly a concern or a belief that there's fraud? Yeah, I believe that it's a discovery of the offense. So I think that's what the language is, that it's a discovery of an offense. If the investors don't believe that an offense occurred, then there's been no discovery of an offense. It's merely that they asked for their money back because they no longer wanted to be involved with this investment, and their money was returned. And I don't think that constitutes discovery of the offense, the offense being a fraud. Let me ask you how you're going to distinguish Bright using that argument. Well, I think because the nurses believe that an offense had occurred, and I don't believe that the investors believe that an offense had occurred. Okay. But Stoddard held that a defendant is not entitled to credit for refunds after detection of a ñ by a victim regardless of any evidence that the refunds were, in fact, paid for detection by law enforcement. That was the case in Bright, right? That's correct. And how would you distinguish Bright from this case? Well, I think in that case that the people involved in that case believed that an offense had occurred, that they had, in fact, been defrauded. And I don't believe the investors in this case had that belief at the time they were requesting their money back. It's my contention that they were investors who decided not to be involved in this investment scheme anymore and asked for their money back. But as you point out, the burden is much more than what you think. You have to demonstrate that the district court was clearly erroneous in what the district court found to be the fact. Now, how would we tip over that factual determination based upon that they didn't go to the police officers or that the judge was wrong in what he believed? What shows is clearly erroneous. Well, I think it's clearly erroneous to say that the letters or the phone calls to Mr. Garrow constitute discovery of the offense. The phone calls and the requests for the money back, I think, is something different than saying, I think you've defrauded me, I think that you've committed some crime against me, and you better give me my money back, rather than requesting. I think a lot of people involved in investments change their minds, want their money back. I think the judge saying that this letter, and the people on the stand, they never said, you know, we thought he was committing a fraud. They said, hey, you know what, we didn't get our money back right away, we didn't think that maybe this was the right investment for us, so we asked for our money back. Even on the stand, many years later, they still didn't say that they believed that Mr. Garrow had committed an offense. But if the defendant believed it would lead to the discovery of the offense and he gave the money back, would that be sufficient? Well, I don't think so, and I don't think that that's the case. And I think that plays into Mr. Garrow's delusional state of mind, which was another issue in the case that was raised as far as the trial issues, and that Mr. Garrow, I think, to this day, believes in the validity of the investment scheme and that he was just trying to make the investors whole by returning their money. And I also think that you think the district court was wrong in thinking that he knew he was doing wrong and that he wasn't doing this to keep from being charged by the government officials? I do. I don't think that he returned the money because he was afraid that these people were going to there was never any threats by any of them to say, hey, if you don't give us our money back, we're going to call the police. Mr. Garrow never had, there's no evidence in the record that he was returning this money in order to avoid them going to law enforcement in order to get, it seems that Mr. Garrow was to make them whole. They didn't want to be part of the investment scheme, and he was giving the money back. He was unaware, you feel the record shows he was unaware that he was doing anything wrong during this time? Well, I think that if Mr. Garrow was provided a new trial based on the newly discovered evidence of his mental state, that he does suffer from a delusional state of mind. And I think that persists through sentencing and through to today. And I think that was something that should have been dealt with, that he should have been against the specific intent of the crime. We're getting off on a tangent here, but he was given that opportunity before trial. But your view is that we would have to factor in that part of it, that he didn't know what he was doing, in order to distinguish right? Well, no, but I think that it is a factor that you asked me the question of whether, if he thought he was returning the money just to avoid getting caught, and I don't think that there's any evidence that that's what he was doing. And I think the district judge saying that or having that part of his opinion is clearly erroneous. And I think, again, he's in jail for 11 years for $37 million, most of which was returned, all but about $3 million. And I think that plays into the unreasonableness of the sentence. Here's a man who, two years before law enforcement got involved, gave most of the money back. And now he's sitting in jail. It's a first-time offense, never been in trouble before. It seems clear that there is some mental disorder. The judge did give him a three-level departure, so there must be some validity to it. And giving this man 11 years, I think, also plays into the unreasonableness of the sentence. And I'd like to reserve about a minute. And so I think, based on all the factors that the judge did not take into consideration, I think giving this man 135 months, which is hugely disparate to the sentences received by other fraud defendants and other people involved in this case, such as TLC President Mr. Cozy, who defrauded 1,800 people and got a 54-month sentence. And Mr. Garrow, who returned most of the money, gets 11 years because he decided to go to trial. And I think that's fundamentally unfair as well. And I'll reserve the rest of my time. Thank you. Thank you. Well, if that was your summary, the real argument must have been really something. Good morning, Your Honors. May it please the Court. Mark Rahe for the United States. I'd like to get right to the amount of loss arguments that the defense counsel made. This Court should not and cannot hold that it requires a victim of a fraud to go to law enforcement for that to be the discovery of the offense. Not only is the Court already aware that this Court rejected that exact proposition in Bright, and it couldn't have been more clear about that, another case, Stoddard, which is often cited in the parties' briefs, and I believe Bright cited it as well, that that same principle was rejected in that case. And that was an escrow fraud case where, just like this case, all of the money that was taken was repaid by the time the indictment was brought, and yet this Court upheld a sentence giving the full amount of loss. And in that case, there were two issues as to when it was possible that that offense was discovered. In one of the court, there were two. One of them was when a bank officer notified the defendant of discrepancies in his account, and the other possibility was when that same bank officer then prepared what was called a criminal referral form that would then initiate law enforcement activity. This Court went with the first one, and that's basically no different than happened here. These investors, as Judge Ikuda pointed out, they weren't just sitting back passively. They were very anxious, and justifiably so. We're not talking about $5,000, $10,000, even $50,000 here. These were all multimillion-dollar amounts. And the other thing I think this Court has to look at is public policy. If you take defense's position here, you're basically requiring victims of a fraud, a complicated fraud, to somehow rise to the level of criminal investigators. And I don't think that exactly promotes public policy. If anything, fraud ought to be construed liberally to protect victims, because that's what we're here to do with these white-collar crime cases. So it falls under the law of Bright and Stoddard. That's all this Court needs. And as you pointed out as well, this is clear error. And I believe that when one looks at the record, Judge Lorenz did the best job he could to arrive at a point that he thought was fair. I know that in their papers, sometimes defense counsel labels these dates as arbitrary and capricious, but they're not. I mean, and the other thing I also ---- In Stoddard, replacements do not apply to actual loss if they are made after discovery of the offense, but prior to indictment, after discovery. Now, there was a factual finding made by the district court that fit within this, that is, there was a discovery. And counsel raises the argument, well, that finding is clearly erroneous because there's no indication that these investors at that time thought there was anything wrong. Criminally, they just wanted their money back. They felt they'd made a mistake. How do you respond to that? Actually, I'm glad you brought that up. If you look at the facts, Child's Hope, which was a major investor, provided $10 million. Stephen Cooney testified, and this is at Supplemental Excerpt of Record, page 350, by this stage of the game, we didn't feel like there was any validity to the program itself, and we were getting tired asking our money back. When he says he doesn't think there's any validity to the program, that to me is exactly what defense counsel is asking for. I mean, what else could that reasonably be inferred than for that person to say this is a fraud? Well, it could be just a bad idea, but you say that that wording means that they thought there was criminal activity when they said there's no validity to the program. I believe it's a reasonable inference. And when this Court looks at it, it's a clear error standard of review, and this is the district judge's call. He sees an investor. You know, this investor didn't just say, oh, I'm a little worried. And the other thing that you have to keep in mind, this was a very crystal clear claim that was made. I will double your investment within 15 days. By the time of the dates that the district court found, it was well beyond that 15 days. This wasn't like, oh, here's a new startup company. I'm looking for investors. We've got a new patent. Maybe a year down the road we'll have certain investments. No. He says 100%, absolute certainty, I will double your investment. By the time these investors are asking for their money back, this is months, weeks after that date. I think that also plays into why the district court's finding is reasonable, because the court could say, if I'm a reasonable investor in that position, I'm not just worried that I'm getting cold feet or that this is a bad investment. I'm getting absolutely nothing. And I was given an unconditional assurance, and that's what I relied on. And that assurance came with representations of escrow companies being involved. I thought I had a sure deal here. Maybe it was stupid. That's not what the law is here to decide. It is to decide what is reasonable. And in determining the discovery of defense, this court settled on dates, I believe, that were reasonable. And he looked at, I believe it was November 18th for TLC America, and that was the $20 million investor. And it was December 8th, 1999 for Child's Hope, the $10 million investor. And when he looked at the amount of money that had been paid beforehand, I believe he ended up with $13.5 million that came after the date of discovery for TLC America, $6.5 million that came after the day of discovery for Child's Hope. Together, that's $20 million. And there's not even any dispute from the defense that Veronica Disabello is still out at least $550,000. On those facts, I believe that the court is not clearly erred. And there are a lot of colorful expressions that this court has used in the past as to what is clear error. And I think somebody once said it has to stink like an unrefrigerated dead fish after three weeks. On this record, when it was this district court who sat through all this testimony, he's got documentary evidence in front of him. He has investors who aren't just a little worried. They realize that they've been completely fleeced. And he has a statement of Stephen Cooney that he didn't feel there was any validity to the program itself. I think that that finding should be upheld, Your Honor. And then it's moving on to some of these other points. Another thing. Can I ask you about sentencing for a moment? Sure. The judge gave a below-guideline sentence, and we have a reasonableness challenge. Do we need to wait for the Supreme Court's decision in Gall next term or wait for our en banc panel and Zavala and Cardi to decide that issue? I don't think so, Your Honor. Perhaps this court will anyway, but I'm glad you brought that point up too because it's interesting. If you look at page 16 of the reply brief, defense counsel themselves concede that a below-guideline sentence would be reasonable under 3553. This was 53 months below. And the reason I say I don't think you have to wait for Zavala or Cardi is because the district court here, he wasn't putting any presumptive weight on the guidelines. He wasn't analyzing the question at all from that point of reference. Instead, when you look at the record, two full days of sentencing hearing, and on the 3553 factors, I think that can't be emphasized enough. I don't know that there have been many decisions from this court that have reversed a case yet on the grounds that a sentence was unreasonable. Every single 3553 factor that the defense has identified in this case was considered by the district court, whether it was age, physical condition, and first-time offense. I want to point out, as we argued below, and I believe the judge found, yes, this was his first conviction, but this was not his first time involved with fraud. And that point can't be made enough. At trial, 404B evidence came out. There was a woman by the name of Suzanne Lovejoy. She gave Mr. Garrow $50,000 when he promised to find her boxes of money in a foreign country. He promised her that he would get her $5 million of profit in two weeks. Has she received a penny to this day? No. That was before trial. And then as we point out in our papers, too, and it's supported by the affidavit of FBI agent Dudley, this defendant has engaged in seriously concerning conduct since the time of his conviction. He's secured hundreds of thousands of dollars from an elderly gentleman by the name of Russell Stern. He also used the guise of a religious visit to fleece the prison authorities to have an individual by the name, I believe it was Neil Stevens, come to the MCC and also to discuss more of these finding boxes of money schemes. And I know in their reply brief the defense characterizes that as prejudicial, irrelevant information. It's not. And they said it wasn't made part of the record. That's not true either. In fact, it's interesting that affidavit, it's not included in the excerpts of record, but you will find it in the supplemental excerpts of record. As we pointed out, I've only been in this job seven years. Maybe to some people that's a lot. In seven years I've never seen a case where somebody who is convicted of an offense and is then pending sentencing engages in similar conduct. And I believe even Judge Lorenz pointed that out. He said, I have concerns if this man is on the street. When there's obviously recidivist potential here, and they cite generic statistics about how recidivism decreases with age, we don't dispute that. What we're saying is look at the actual facts here. Those statistics, which are generic, don't apply to this conduct. So if they want to talk about an 11-year sentence being unreasonable, we would say for those factors it's not. And we would point out it's 53 months below the guideline range, which at page 16 of their reply brief would seem to indicate that should be the end of the question. And I realize I only have 30 seconds left, but I want to make one brief comment on the mental health issues. I kind of put that more on the trial side. That report from Dr. DeFrancesca, that came out 18 months after trial. It was based on one four-hour interview. She says two times in that report, I do not know how long these delusional symptoms will be present. By the time you get to the reply brief, it seems as though the defense is already assuming this is the state of the law and this is a fact. That's not true. And I don't think it goes into the evaluation of the sentence anyway. But what happened? Judge Lorenz gave 53 months break, three-level, the equivalent of a three-level departure anyway, in order to account for any possible mental health issues. Their only complaint isn't that the judge didn't consider 3553 factors, but simply that he didn't go down enough from what they wanted. And as my last sentence, I'd say before the guidelines became advisory, this Court would never review the extent of a departure that was discretionary. I would say the same policy applies here. Their complaint can't be the record. Judge Lorenz, I mean, if you look at those sentencing transcripts, two very thick. He analyzed everything. He gave them credit for his age. And unless there are any further questions, we would submit. Thank you. Thank you. I'll just take a moment. I would just like to point out that some of the things mentioned by counsel about things that occurred after all of these things occurred after the offense occurred, the issue with Ms. Lovejoy, the things at the jail, and I think these all go to the fact that he has a mental problem. Here's a man who's 60 years old, has never committed offense. He's involved in this investment scheme. And from that point on, there are other things and other things that counsel wants to bring up to prejudice against Mr. Garrow. But these all occur after this offense when he probably, if we had more time and had been given a further evidentiary hearing, to explore the fact that he does have a valid delusional mental disorder that is why a man who at 60 years old starts acting so erratically and so differently. And I think this should have been taken into consideration. And I think 135 months is a very unreasonable sentence for a man who returned most of the money. Most of these people were made completely whole, except for Veronica who got all but $500,000 back. 135 months, 11 years for a man who clearly has mental problems and who returned the money I think is an unreasonable sentence, and we hope that the court finds that. Thank you. Thank you.
judges: Wallace, Ikuta, Smith